**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LUIZ CASANOVA, | : | CIVIL CASE NO. |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| CITY OF NEW HAVEN, | : | |
| Defendant. | : | NOVEMBER 3, 2017 |

**COMPLAINT**

### I.   PRELIMINARY STATEMENT

1. This action seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and costs and attorney fees for the retaliation suffered by the plaintiff when the City of New Haven, and its decision-makers intentionally retaliated against him, in violation of the provisions of Title 42 U.S.C. § 1981, because the plaintiff opposed the overt race discrimination directed by the defendant at Sergeant Wilfredo Cruz, a co-worker of the plaintiff.

2. This action seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and costs and attorney fees for the retaliation suffered by the plaintiff when the City of New Haven, and its decision-makers intentionally retaliated against him, in violation of the provisions of Title 42 U.S.C. § 1981,

because the plaintiff provided testimony at a fact-finding hearing conducted by the State of Connecticut Commission on Human Rights and Opportunities, on its behalf, and on behalf of the United States Equal Employment Opportunity Commission, regarding the overt race discrimination directed by the defendant at Sergeant Wilfredo Cruz, a co-worker of the plaintiff.

## II.    JURISDICTION

3.    This action arises under the provisions of Title 42 U.S.C. §1981, made actionable against the defendant, city of New Haven, pursuant to the provisions of Title 42 U.S.C. § 1983.

4.    Jurisdiction is invoked pursuant to Title 28 U.S.C. § 1331, Title 28 U.S.C. § 1343(a)(3), Title 28 U.S.C. § 1343(a)(4), Title 28 U.S.C. § 220l(a), Title 42 U.S.C. § 1981, and Title 42 U.S.C. § 1983.

5.    Declaratory, injunctive, compensatory and equitable relief is sought pursuant to Title 28 U.S.C. §2201, and Title 28 U.S.C. §2202.  Compensatory and punitive damages are sought pursuant to Title 42 U.S.C. §1981 and Title 42 U.S.C. §1981a.

6.    Costs and attorney fees may be awarded pursuant to Title 42 U.S.C. §1988.

### III.   VENUE

7.   This action properly lies in the District of Connecticut pursuant to Title 29 U.S.C. §1391(b) because the claims arose in this judicial district.

### IV.   PARTIES

8.   The plaintiff, a member of the Hispanic race, is a citizen of the United States, residing in North Branford, Connecticut.

9.   The defendant is a political subdivision of the State of Connecticut; it is a municipal corporation, organized and existing under the laws of the State of Connecticut.

10.   The defendant is a person within the meaning of Title 42 U.S.C. § 1983.

11.   The defendant, at all times relevant to this action, acted under color of state law.

### V.   STATEMENT OF FACTS

12.   In 1996, the defendant hired the plaintiff as a police officer in the New Haven Police Department.

13.   Throughout his employment with the defendant, from 1996 through the present date, the plaintiff performed his job duties, and responsibilities in an exemplary manner.

3

14. Based on his job performance, the plaintiff has received numerous decorations, commendations, and promotions bestowed on him by the defendant, including his appointment to the position of Assistant Chief in the New Haven Police Department.

15. In February 2015, while serving as the New Haven Police Department Operations Chief, the plaintiff had the responsibility for identifying, and recommending candidates to the Chief of Police to serve as district commanders.

16. In February of 2015, the plaintiff recommended Sergeant Wilfredo Cruz to the Chief of Police Dean Esserman as a qualified candidate for appointment to the vacant East Shore district commander position.

17. Based on the recommendation of the plaintiff, Sergeant Cruz was transferred from patrol operations to the position of district commander of District #9, the East Shore district of New Haven.

18. Shortly after the transfer of Sergeant Wilfredo Cruz to district commander of District #9, Chief of Police Esserman informed the plaintiff that New Haven local politicians were unhappy with the transfer of Sergeant Wilfredo Cruz to District #9 commander.

19. Chief Esserman refused to explain to the plaintiff why the elected officials were opposing the assignment of Sergeant Wilfredo Cruz to the district commander position; he simply stated that "Cruz was not the person the elected officials wanted for District #9."

20. The plaintiff attempted to contact the elected officials on his own to determine what issues they may have had with the appointment of Sergeant Wilfredo Cruz as district commander, however, his calls and messages went unanswered.

21. The following week Chief Esserman met with the assistant chiefs of the New Haven Police Department, Luiz Casanova, Al Vasquez, Anthony Campbell and Archie Generoso, to discuss the assignment of Sergeant Wilfredo Cruz.

22. During this meeting, Chief Esserman explained that the transfer of Sergeant Wilfredo Cruz to District #9 was causing issues for the mayor and him; he asserted that Aldermen Al Paolillo, Jr. demanded that the transfer of Sergeant Wilfredo Cruz be rescinded, and that he be replaced with Sergeant Roy Davis.

23. Sergeant Roy Davis is a Caucasian member of the New Haven Police Department, whereas Sergeant Wilfredo Cruz is Hispanic.

24. During this meeting, the plaintiff unequivocally voiced to Chief Esserman his opposition to transferring Sergeant Wilfredo Cruz from the district commander

position for District #9, because, in his reasonable opinion, he viewed the transfer as racially motivated.

25. In response to the plaintiff's inquiry about the reasons for transferring Sergeant Wilfredo Cruz from the district commander position for District #9, Chief Esserman explained that Alderman Paollilo had threatened to hold up major financial transactions if the police department did not accede to his demand that Sergeant Wilfredo Cruz be replaced by Sergeant Roy Davis.

26. The plaintiff again objected to the proposed transfer of Sergeant Wilfredo Cruz because of the obvious racial motivation behind the transfer.

27. At that time, District #9 had a history of only white district managers, and Alderman Paolillo demand to replace Sergeant Wilfredo Cruz with Sergeant Roy Davis would have continued that tradition.

28. After the plaintiff expressed his opposition to replacing Sergeant Wilfredo Cruz to Chief Esserman, Chief Esserman responded by stating, "the guy is a racist," referring to Alderman Paolillo.

29. The other assistant chiefs attending the meeting with Chief Esserman agreed that the transfer of Sergeant Wilfredo Cruz was racially motivated.

30. In response to the plaintiff's suggestion that if Sergeant Wilfredo Cruz was to be removed, his replacement should be a qualified black lieutenant, Chief Esserman stated that the plaintiff's suggestion would "make the matter worse."

31. At this point, the chief became visibly irritated and adjourned the meeting.

32. The following week Chief Esserman once again summoned the plaintiff to his office, and instructed the plaintiff to transfer Sergeant Wilfredo Cruz.

33. Chief Esserman advised the plaintiff that he had to reconsider his opposition to the transfer of Sergeant Wilfredo Cruz, otherwise he would be removed from his assignment as Operations Chief.

34. Approximately one month later, the plaintiff, not having reassigned Sergeant Wilfredo Cruz, was summoned to the Chief's office, and told by the Chief that he was being transferred from his current position in Operations Command, to Professional Standards.

35. The plaintiff expressed his displeasure with the transfer to Chief Esserman, and inquired whether the transfer was related to his opposition to the reassignment of Sergeant Wilfredo Cruz.

36. After a lengthy discussion, Chief Esserman admitted that the plaintiff's refusal to transfer Sergeant Wilfredo Cruz was the real reason behind the plaintiff's removal as operations commander.

37. In reaction to the plaintiff's reassignment, many citizens of New Haven voiced concerns to the Mayor over the plaintiff's transfer from Operations Command, which resulted in the Mayor's Chief of Staff setting up a private meeting with the plaintiff.

38. During the meeting, the Chief of Staff advised the plaintiff to accept the transfer to Professional Standards, and warned the plaintiff that if he did not conform, his future with the New Haven Police Department "would be bleak."

39. Several weeks later, the Mayor, with her staff present, met with the Chief, and assistant chiefs of the New Haven Police Department, during which meeting, the Mayor expressed her desire that Sergeant Wilfredo Cruz be reassigned based on her need to appease Alderman Paolilo, whose vote was needed by the Mayor to move certain financial transactions forward.

40. The plaintiff remained firm, and once again expressed his opposition to the racially motivated transfer of Sergeant Wilfredo Cruz.

41. In September of 2016, after the plaintiff had been removed as Operations Chief, Sergeant Wilfredo Cruz was transferred and replaced with Sergeant Roy Davis.

42. Sergeant Cruz then filed a discrimination complaint against the City of New Haven with the State of Connecticut Commission on Human Rights and Opportunities.

43. In October of 2016, the plaintiff was contacted by outside counsel representing the City of New Haven in a case brought, and filed by Sergeant Wilfredo Cruz with the State of Connecticut Commission on Human Rights and Opportunities to discuss the plaintiff's likely testimony when a hearing was scheduled on the complaint of Sergeant Wilfredo Cruz.

44. The plaintiff explained to the outside counsel that he would not be able to provide testimony or evidence that would be favorable to the City of New Haven regarding the transfer of Sergeant Wilfredo Cruz, and that his testimony, however, would be sympathetic to Sergeant Wilfredo Cruz in opposing the race discrimination to which Sergeant Cruz was subjected by the City of New Haven.

45. Outside counsel became abrasive, and informed the plaintiff that Interim Chief of Police Anthony Campbell, required the plaintiff to oversee the City of New Haven's response to the complaint filed by Sergeant Wilfredo Cruz.

46. Thereafter, in December of 2016, the plaintiff, in his capacity of assistant chief, addressed a police officer about the sloppy appearance of the uniform which he was wearing while on patrol duty.

47. During the exchange with the police officer, the plaintiff stated to him to fix his hat "so that you don't look like a "mope"."

48. Mope is a racially neutral term, and according to the Merriam-Webster dictionary, has the following meaning, "to give oneself up to brooding: become listless or dejected I was feeling depressed and just moped around all day."

49. The interim chief of police seized on this incident to retaliate against the plaintiff; he telephoned the plaintiff that evening, and placed the plaintiff on administrative leave, dishonestly claiming that the words used by the plaintiff to counsel the police officer were racially charged and motivated.

50. The interim chief of police placed the plaintiff on administrative leave without conducting any formal investigation, and then distorted the facts that he released to the media so as to hold the plaintiff up to public ridicule, and embarrassment.

51. After it had been reported in several publications that the plaintiff had made a racially charged statement to the officer, Interim Chief Campbell eventually

released a statement indicating that the plaintiff had not said, or done anything that could be construed as racially charged.

52. Interim Chief Campbell then suspended the plaintiff without conducting a thorough investigation, justifying the suspension based on the untrue claim that the plaintiff had used a profanity when addressing the police officer.

53. In his defense, the plaintiff explained to the interim chief, to no avail, that the interim chief had not interviewed key witnesses to the incident, nor had he conducted a proper investigation of the incident; an eye witness who was present for the entire exchange between the officer and the plaintiff was never interviewed.

54. Interim Chief Campbell disciplined the plaintiff knowing full well that there was exculpatory evidence that would have proved the plaintiff's innocent of using racially charged terms, or employing profane language.

55. Interim Chief Campbell imposed discipline on the plaintiff in front of the plaintiff's peers, purposely humiliating the plaintiff.

56. Immediately following the imposition of discipline, the plaintiff was once again held up to ridicule and embarrassment based on the false information released by Interim Chief Campbell to the media regarding the plaintiff's suspension.

57. Interim Chief Campbell's decision to discipline the plaintiff in front of his peers was contrary to the past practices of the police department regarding the imposition of discipline.

58. During the five years the plaintiff served as an assistant chief, the police chief had never made disciplinary actions public, nor had any employee been disciplined in front of the officer's peers.

59. The actions taken by Interim Chief of Police in placing the plaintiff on administrative leave, and then suspending him for one day, were in retaliation against the plaintiff because of his opposition to the racially motivated transfer of Sergeant Wilfredo Cruz, and because the plaintiff had informed counsel for the City of New Haven that he would provide supportive testimony for Sergeant Wilfredo Cruz in the race discrimination case brought against the City of New Haven by Sergeant Wilfredo Cruz.

60. In January of 2017, the plaintiff was contacted by a reporter inquiring about toys that were donated to the New Haven Police Department, indicating that there was a claim of missing toys, and asked the plaintiff if he had allowed New Haven Police Department officers to take the donated toys for their own families.

61. The plaintiff explained to the reporter that no officer took any toys, and that the items were given to families in need.

62. The plaintiff also provided the reporter with names of community and board of education members with contact information to confirm the distribution of the toys.

63. Interim Chief Anthony Campbell was fully aware of the toy program; he possessed firsthand knowledge of the toy distribution process, because a year prior he, and the plaintiff had a conversation with Chief Esserman regarding the distribution of the toys.

64. Nevertheless, Interim Chief Anthony Campbell contributed misleading information to the story in the New Haven Register, and purposely portrayed the plaintiff in a negative, and untrue light.

65. Chief Anthony Campbell then launched a bogus investigation into the toy program, even though he had personal knowledge regarding the untruthfulness of the claim that police officers were being given the donated toys to take home.

66. The investigation was never concluded, nor was the plaintiff ever notified of the outcome of the illusory investigation.

67. The entire incident was used by the defendant, acting through the interim chief of police, to embarrass, and harass the plaintiff as part of a continuing course of

conduct in retaliation against the plaintiff over his opposition to the transfer of Sergeant Wilfredo Cruz, and because of his expected testimony before the Commission on Human Rights and Opportunities.

68. Interim Chief Anthony Campbell continued retaliating against the plaintiff when in January of 2017, he had the plaintiff, and the officers under the plaintiff's supervision, who were assigned to the police academy, investigated for recommending the removal of candidate attending the academy who did not meet the minimum standards of the academy.

69. At a meeting called by Chief Anthony Campbell to address the disqualification of the recruit, Chief Campbell raised false allegations regarding the academy procedure for removing a recruit, a process which remained unchanged from an earlier time when Chief Anthony Campbell oversaw the academy.

70. During this meeting, Chief Anthony Campbell assigned Assistant Chief Reyes, and Assistant Chief Generoso to investigate the recruit's removal, going as far as ordering the Internal Affairs division, which was under the plaintiff's command, to investigate the plaintiff, and the academy staff.

71. Officers from the Internal Affairs division needlessly searched the academy staff's offices and interviewed the academy staff.

72.  The investigation was never concluded, nor was the plaintiff informed of its outcome.

73.  The investigation ordered by Chief Anthony Campbell into the plaintiff's conduct in removing the police recruit was in retaliation against the plaintiff because of the plaintiff's opposition to the transfer of Sergeant Wilfredo Cruz, and because of the plaintiff's expected testimony before the Commission on Human Rights and Opportunities.

74.  The plaintiff, in an effort to stop the retaliation to which he was continually being subjected by the Chief of Police, scheduled a meeting with the City of New Haven Chief Administrative Officer, Michael Carter, whose responsibility includes issues involving the police department.

75.  During this meeting, the plaintiff spoke about the toy situation and fully explained what happened with the toys, and the untruthfulness of the information disseminated by the Chief of Police.

76.  The plaintiff also attempted to explain to Mr. Carter his concerns regarding the constant harassment, and retaliation to which he was being subjected by Interim Chief Anthony Campbell.

77.    After the plaintiff expressed his concerns about the retaliation to which he had been continually subjected by Interim Chief Anthony Campbell, Mr. Carter concluded the meeting by sharing the following demeaning story: "A little bird refused to join the flock which was flying south for the winter. It refused to listen to its parents and elders, thinking that it could tough it out. Winter came, and it was so cold that the bird froze and fell to the ground covered with snow. A cow came by and dropped some dung on the bird. The pile of cow dung warmed the bird and brought it back to life. It lay there all warm and happy, and soon began to sing for joy. A passing cat heard the bird singing took the bird out of the pile of cow dung, and ate it."

78.    When the plaintiff asked Mr. Carter to explain the story, he said: "When you're in deep shit, it's best to keep your mouth shut!"

79.    Carter's story was inappropriate and offensive, and an overt threat of further retaliation against the plaintiff for not "flying with the flock."

80.    Soon thereafter, the plaintiff met with the Mayor's Chief of Staff, Thomas Reyes, to explain to him the retaliation, and harassment to which he was being subjected.

81.    Reyes told the plaintiff that he would set up a meeting with the Mayor so as to have the Mayor intervene to curb the harassment, and retaliation.

82. In February of 2017, the plaintiff eventually met with the Mayor of the City of New Haven, and Thomas Reyes, during which meeting the plaintiff informed them that he was the subject of a continuing course of retaliatory conduct, and mistreatment at the hands of Interim Chief of Police Anthony Campbell.

83. The Mayor informed the plaintiff that she would have a conversation with Interim Chief Anthony Campbell to put an end to the retaliatory acts directed at the plaintiff.

84. The plaintiff explained to the mayor that the information she was receiving about him "bad mouthing" her was untrue.

85. The Mayor told the plaintiff not to be concerned, and that it is perfectly okay for folks to express themselves to others.

86. Once again, the plaintiff explained to her that he had said nothing negative about her, while relating to her the constant harassment and baseless investigations to which he had been subjected by Interim Chief Anthony Campbell.

87. After carefully listening to the plaintiff's concerns, the Mayor concluded the meeting by assuring the plaintiff that she would attempt to resolve the issues of harassment that were taking place at the police department, and that she would she would follow up with him on the matter.

88. The mayor never contacted the plaintiff after their meeting in February 2017 to discuss the issues of retaliation raised at the meeting.

89. In May of 2017, the mayor contacted the plaintiff, who was then a candidate for appointment to the position of Chief of Police, to inform the plaintiff that she had decided to appoint Interim Chief Anthony Campbell to that position on a permanent basis instead of the plaintiff, even though Interim Chief Anthony Campbell did not meet the minimum qualification requirements for appointment to the position of New Haven Chief of Police.

90. Chief of Police Anthony Campbell's race is African American, while the plaintiff's race is Hispanic.

91. The Mayor selected Interim Chief Campbell even though he did not meet the qualifications for appointment to the position of Chief of Police pursuant to the rules, regulations, ordinances, and charter of the City of New Haven, while the plaintiff was fully qualified for appointment to the position of Chief of Police.

92. The Mayor appointed Chief Campbell to the position of Chief of Police, having full knowledge that he did not meet the charter qualifications required for a candidate to serve as Chief of Police.

93. The selection process for the position of Chief of Police was a charade, and the Mayor had no intention of selecting the plaintiff as Chief of Police, or giving the plaintiff a fair opportunity to compete for the position.

94. The rejection of the plaintiff for appointment to the position of Chie of Police, was an act of retaliation directed at the plaintiff because he had opposed the discriminatory treatment of Sergeant Wilfredo Cruz, and because of his expected testimony before the Commission on Human Rights and Opportunities supportive of Sergeant Wilfredo Cruz's claims of race discrimination.

95. On May 22, 2017, Interim Chief Campbell ordered the plaintiff to report to his office for a meeting that included the plaintiff, Interim Chief Campbell, and Human Resource Director, Stephen Labrandi.

96. Interim Chief Campbell commenced the meeting by stating "this is going to be a tough conversation, so I asked Stephen Labrandi to be present as a witness."

97. Chief Campbell then stated that since the Mayor had named him Chief of Police, he wanted the plaintiff to retire.

98. The plaintiff informed Interim Chief Campbell that he had no intention of retiring.

99. Interim Chief Campbell then warned the plaintiff that if he didn't retire, he would remove the plaintiff of his responsibilities.

100. Interim Chief Campbell further informed the plaintiff that, effective immediately, he was removing the Internal Affairs division from the plaintiff's command, and then went on to threaten the plaintiff's employment, stating "if you don't retire by the end of June, I will take your other responsibilities away and give them to another Assistant Chief."

101. Interim Chief Campbell reiterated, in no uncertain terms, that it would be beneficial for the plaintiff to retire, as he planned to continue to marginalize the plaintiff's role as an Assistant Chief.

102. When he finished threatening the plaintiff, Interim Chief Campbell and Mr. Labrandi indicated to the plaintiff that the city might be able to do something beneficial for the plaintiff that would make his retirement more agreeable.

103. In a separate meeting in the plaintiff's office, Mr. Labrandi explained that he understood that the request made by the Chief of Police for the plaintiff to retire was traumatic; he advised the plaintiff to take a few days to digest the information before meeting with him to discuss a package from the city intended to make the plaintiff's decision to retire "easier."

104. Approximately one week later, Mr. Labrandi met with the plaintiff, and indicated that he would ask Mike Carter, the Chief Administrative Officer, what the city would offer the plaintiff to encourage his retirement.

105. Sometime thereafter, the plaintiff spoke with Mr. Labrandi and informed Mr. Labrandi that he had not heard from Mr. Carter, or Mr. Labrandi regarding the inducements the city proposed to offer the plaintiff in return for his retirement.

106. The plaintiff reminded Mr. Labrandi that the Internal Affairs division had not been restored to the plaintiff's responsibilities, to which Mr. Labrandi replied, "everything is status quo."

107. Prior to the threats being directed at the plaintiff by Interim Chief Campbell, the plaintiff had informed the defendant that he would be providing testimony supportive of Sergeant Wilfredo Cruz at a fact-finding hearing before the Connecticut Commission on Human Rights and Opportunities, which was investigating the discrimination complaint of Sergeant Cruz.

108. At the fact-finding hearing, the plaintiff asserted that the transfer of Sergeant Wilfredo Cruz was racially motivated.

109. Interim Chief Campbell's threats and his efforts to force the plaintiff to retire by marginalizing his authority as an assistant chief were retaliatory because of the

plaintiff's vocal opposition to the race discrimination to which Sergeant Wilfredo Cruz had been subjected, as well as the expected testimony he would provide in a fact-finding hearing before the Connecticut Commission on Human Rights and Opportunities supportive of the discrimination complaint of Sergeant Wilfredo Cruz.

110. After his meeting with Interim Chief Campbell, the plaintiff met with a retired Lieutenant from the New Haven Police Department, who had also been a candidate for the permanent chief's position, who cautioned the plaintiff that the plaintiff had to be extremely careful because the city was trying to set him up for termination.

111. The retired lieutenant asserted that because he had refused to commit to terminating the plaintiff's employment if named chief of police, he was effectively disqualified from appointment as New Haven's Chief of Police.

112. The retired lieutenant further stated that he was in possession of text messages between himself and city officials, including the Mayor, that would establish their intent to malign the plaintiff's reputation, and force him out of the New Haven Police Department.

113. In response to the plaintiff's inquiry as to why the city authorities were forcing the plaintiff out of his position, the retired lieutenant stated that the Mayor didn't like

the plaintiff because he stood up to the City politicians, especially when it came to the reassignment of Sergeant Wilfredo Cruz.

114. In August of 2017, Chief Campbell, with Michael Carter, the city's chief administrative officer, acting as a witness, met with the plaintiff, who was questioned about his conduct at the Police Academy.

115. Chief Campbell had two memoranda in his possession, referring to them during the meeting.

116. Chief Campbell falsely alleged that the plaintiff had a meeting with his police academy staff, where he had made disparaging remarks regarding a disciplinary order issued by Chief Campbell, which required several New Haven Police Officers to receive remedial training.

117. Chief Campbell further alleged that the plaintiff was disrespectful towards his rank when the plaintiff was addressing the police academy staff, specifically Lieutenant Tuzolli, the temporary police academy commander.

118. Chief Campbell would not share the memoranda with the plaintiff, nor did he provide the plaintiff with a copy so that he could defend himself against the false accusations.

119. The plaintiff disputed Chief Campbell's allegations, and advised him there were several witnesses who should be interviewed before the Chief considered taking any disciplinary action against the plaintiff.

120. Chief Campbell refused to consider any exculpatory evidence, and summarily placed the plaintiff on administrative duty, effectively stripping the plaintiff of his responsibility over the training academy.

121. Chief Campbell then ordered an internal affairs investigation of the sham allegations.

122. The plaintiff continued to request that Chief Campbell inquire further into the matter.

123. The plaintiff then expressed his belief to Chief Campbell that the Chief's most recent untruthful allegations had nothing to do with the police academy meeting, but instead had to do with their May 22, 2017, meeting where he threatened to strip the plaintiff of all responsibility if the plaintiff had not retired.

124. Chief Campbell admitted that the plaintiff's accusation was true by stating: "Yes, it is."

125. Following this meeting with Chief Campbell, the internal investigation unit conducted its investigation and interviewed all witnesses; six out of the eight

witnesses, who were present at the meeting where the plaintiff supposedly disrespected Chief Campbell, testified that the plaintiff had not said, nor done anything wrong.

126. Chief Campbell, who had been provided with this exculpatory information, refused to change the plaintiff's administrative status, and instead prolonged the investigation by having the New Haven corporate counsel reinvestigate the matter.

127. The placing of the plaintiff on administrative status, stripping him of his responsibilities, and initiating an internal affairs investigation were taken by the Chief of Police in retaliation against the plaintiff because the plaintiff opposed the race discrimination directed at Sergeant Wilfredo Cruz, and because he testified at the fact finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz.

128. On August 12, 2011, the plaintiff was involved in a serious motor vehicle accident resulting in the plaintiff suffering serious physical injuries to several parts of his back and neck, which resulted in the plaintiff being unable to work on various occasions where medical treatment was required.

129. The plaintiff's claim had been accepted since 2011, by the City of New Haven as compensable under the Connecticut Workers' Compensation Act.

130. In August 2017, the plaintiff's physician once again required the plaintiff to take a leave from work because of the intense pain he was experiencing and so that the plaintiff could start a new regiment of treatment.

131. The plaintiff provided the department with medical documentation given to the plaintiff by his treating physician showing that his current condition was causally related to the 2011 accident.

132. On September 27, 2017, the plaintiff received a certified letter from CIRMA, the City of New Haven's workers' compensation insurer, denying the plaintiff's workers' compensation coverage for what had been an accepted claim since 2011.

133. Upon contacting the CIRMA representative, Joseph Salcito, the plaintiff questioned why the claim had been denied.

134. Joseph Salcito stated that he knew that the plaintiff had a legitimate work injury, but he was instructed to deny the claim by "higher ups" in the New Haven Police Department, and City Hall.

135. Mr. Salcito was very apologetic, stating, "I hope you understand, my hands are tied."

136. The plaintiff subsequently asked Mr. Salcito to provide him with the names of the people who ordered him to deny the plaintiff's claim and he stated, "I cannot tell you."

137. The plaintiff has suffered financially because of the defendant's unlawful retaliatory conduct.

138. The plaintiff has suffered emotional distress because of the defendant's unlawful retaliatory conduct.

139. The plaintiff has been denied appointment to the position of Chief of Police because of his opposition to the transfer of Sergeant Wilfredo Cruz, and because of his expected testimony before the Commission on Human Rights and Opportunities.

## VI. FIRST CAUSE OF ACTION (Unlawful Retaliation in Violation of Title 42 U.S.C. § 1981)

140-278. The plaintiff incorporates as if re-alleged paragraphs 1 through 139.

279. The plaintiff has been subjected to an unceasing pattern of harassment and retaliation since objecting to the racially motivated transfer of Sergeant Wilfredo Cruz, and testifying at the fact-finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz, as follows:

a. Stripped the plaintiff of many of the essential duties and responsibilities as an assistant chief in the New Haven Police Department;

b. Transferred from his position as Operations Chief;

c. Deprived the plaintiff of his responsibility over the Police Academy;

d. Deprived the plaintiff of his responsibility over Professional Standards, and Internal Affairs;

e. Placing the plaintiff on administrative leave based on fallacious, and baseless reasons, including counseling an officer for his appearance;

f. Falsely accusing the plaintiff of employing a racially derogatory term;

g. Pressuring the plaintiff to retire from the New Haven Police Department;

h. Subjecting the plaintiff to bogus investigations, one dealing with the plaintiff employing the term "mope," another supposedly for speaking derogatorily of Interim Chief Campbell, and yet another, for the Christmas toy campaign for needy families;

i. Denying coverage for the plaintiff's accepted workers' compensation injury;

j. Continually interfering with the plaintiff's authority as an assistant chief; and

k. Refusing to appoint the plaintiff as Chief of Police of the City of New Haven.

280. Despite complaining to the Mayor, the Chief Administrative Officer, and the Human Resources Director, on various occasions about the retaliatory behavior directed toward him, the defendant took no action to protect the plaintiff from such retaliation.

281. As a result of the retaliatory behavior to which the plaintiff has been subjected by the City of New Haven, its Mayor, Chief of Police, and other City of New Haven officials, the plaintiff has suffered substantial economic losses.

282. As a result of the retaliatory behavior to which the plaintiff has been subjected by the City of New Haven, its Mayor, Chief of Police, and other City of New Haven officials, the plaintiff has suffered emotional distress.

283. Prior to opposing the racially motivated transfer of Sergeant Wilfredo Cruz, and testifying at the fact-finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz, the plaintiff had performed his duties as an assistant chief in an exemplary manner, and was held in high regard by city officials and the chief of police.

284. Prior to opposing the racially motivated transfer of Sergeant Wilfredo Cruz, and testifying at the fact-finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz, the plaintiff had not been subjected to the harassing, and retaliatory

behavior by the City of New Haven, its Mayor, Chief of Police, and other City of New Haven officials as outlined in the preceding paragraphs.

285. The hostile work environment was created by the City of New Haven, its Mayor, Chief of Police, and other City of New Haven officials to punish the plaintiff for opposing the racially motivated transfer of Sergeant Wilfredo Cruz, and testifying at the fact finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz.

286. The City of New Haven, its Mayor, Chief of Police, and other City of New Haven officials have demonstrated their retaliatory bias against the plaintiff by subjecting the plaintiff to an unceasing pattern of harassment that has resulted in the plaintiff being treated in a demeaning and degrading manner.

287. The City of New Haven, its Mayor, Chief of Police, and other City of New Haven officials, have intentionally, and with a discriminatory animus, denied the plaintiff an appointment to the position of Chief of Police, subjected the plaintiff to unfair criticism and treatment on account of the plaintiff's opposition to racial discrimination, and his participation in the fact finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz.

288. Notwithstanding the retaliatory conduct to which the plaintiff has been subjected, the plaintiff has continued to perform his job duties in a capable manner, when allowed to do so.

289. The plaintiff's complaints to the defendant about the retaliatory treatment to which the plaintiff had been subjected have gone unheeded; the defendant took no meaningful action to curb the retaliatory behavior and harassing conduct to which the plaintiff has been subjected by the Mayor, the Chief Administrative Officer, and the Human Resources Director, or to investigate or address such conduct in any meaningful manner.

290. The plaintiff is fully qualified to perform the duties of the position of Assistant Chief, and that of Chief of Police.

291. The plaintiff, at all times, has performed the duties of the position of assistant chief in a competent, and professional manner.

292. The mayor, and the Chief of Police exercise supervisory authority and control over the plaintiff's work and his work environment.

293. The actions of the City of New Haven, its Mayor, the Chief of Police, the Chief Administrative Officer, and the Human Resources Director have created a pervasive hostile work environment characterized by unlawful retaliation, which permeated the

workplace to which the plaintiff was assigned while working as assistant chief in the New Haven Police Department.

294. Although the plaintiff has made the Mayor, and the Chief of Police aware of the unlawful retaliatory conduct to which he has been subjected, they have taken no meaningful action to prevent this unlawful behavior.

295. The defendant, by not taking appropriate steps to curb the retaliatory behavior and harassing conduct to which the plaintiff has been subjected, engaged in unlawful retaliation against the plaintiff with malice and/or reckless indifference to the plaintiff's rights under Title 42 U.S.C. § 1981.

296. A reasonable person in the plaintiff's position would find the conduct of the City of New Haven, its Mayor, the Chief of Police, the Chief Administrative Officer, and the Human Resources Director to be highly offensive.

297. A reasonable person in the plaintiff's position would find that the conduct of the City of New Haven, its Mayor, the Chief of Police, the Chief Administrative Officer, and the Human Resources Director would substantially interfere with his or her job performance.

298. The plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged and the plaintiff is now suffering and will continue to suffer irreparable injury from his treatment by the defendant unless the defendant is enjoined by this Court.

299. The plaintiff is now and will continue to suffer emotional distress as a direct result of the defendant's unlawful retaliation.

300. The plaintiff has suffered economic injury as a direct result of the defendant's unlawful retaliation.

301. The defendant discriminated against the plaintiff on the basis of the plaintiff's opposition to the defendant's unlawful race and color discrimination when he objected to the racially motivated transfer of Sergeant Wilfredo Cruz, and when he testified at the fact-finding hearing before the Connecticut Commission on Human Rights and Opportunities investigating the discrimination complaint of Sergeant Wilfredo Cruz.

302. Because the plaintiff's opposition to the defendant's race and color discrimination was the determinative factor in the retaliatory and harassing treatment to which the plaintiff was subjected by the City of New Haven, its Mayor, the Chief of Police, the Chief Administrative Officer, and the Human Resources Director, the defendant violated Title 42 U.S.C. § 1981.

303.    The defendant engaged in discrimination against the plaintiff with malice or reckless indifference to the plaintiff's rights under Title 42 U.S.C. § 1981.

304.    The defendant acted at all times under the color of law.

305.    The City of New Haven is a public-sector employer.

306.    The Mayor of the City of New Haven, and its Chief of Police exercise supervisory authority and control over the plaintiff's work and his work environment.

307.    The Mayor of the City of New Haven, and its Chief of Police are decision-makers for the New Haven Police Department.

308.    The Mayor of the City of New Haven, and its Chief of Police intentionally retaliated against the plaintiff.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, THE PLAINTIFF PRAYS THAT THIS COURT:

As to all Causes of Action:

  (a)    Declare the conduct engaged by the defendant to be in violation of the plaintiff's rights;

  (b)    Enjoin the defendant from engaging in such conduct;

  (c)    Order the defendant to appoint the plaintiff to the position of Chief of Police of the New Haven Police Department;

  (d)    Award the plaintiff economic damages based on his loss of income;

  (e)    Award plaintiff compensatory damages;

  (f)    Award plaintiff costs and attorney fees; and

  (g)    Grant such other and further relief as the Court may deem just and proper.

**THE PLAINTIFF REQUESTS A TRIAL BY JURY.**

THE PLAINTIFF – LUIZ CASANOVA

BY/s/ Thomas W. Bucci
        Thomas W. Bucci
        Fed. Bar #ct07805
        WILLINGER, WILLINGER & BUCCI, P.C.
        855 Main Street
        Bridgeport, CT  06604
        Tel: (203) 366-3939
        Fax: (203) 337-4588
        Email: thomaswbucci@outlook.com